## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **JEFFERY PAUL WILSON** and **SHONI LEE CARD**, | Case No. **05-65161-12** |
| Debtors. | |
| In re | |
| **WILSON SCOTCH MOUNTAIN ANGUS LLC**, | Case No. **06-60369-12** |
| Debtor. | |

## MEMORANDUM OF DECISION

At Butte in said District this 7th day of November, 2007.

After due notice the Court held a hearing on confirmation of Debtors' Chapter 12 Plan in the above-captioned jointly administered cases, after due notice, at Missoula on August 30, 2007, along with a hearing on the motion for adequate protection (Docket No. 279) filed by secured creditor Paul E. Harper Revocable Trust ("Harper Trust"), which also filed objections to confirmation. Debtors filed a Sixth Amended Chapter 12 Plan on July 26, 2007, (Docket No. 293) and were represented by attorney Gary S. Deschenes ("Deschenes") of Great Falls, Montana. Debtor Jeffery Paul Wilson ("Jeffery") testified, and the attachments[1] to Debtors' Sixth Amended Plan were admitted into evidence as Exhibit ("Ex.") 1 without objection.

---

[1]Consisting of eight (8) pages at Docket No. 293.

1

Harper Trust was represented at the hearing by attorney Harold V. Dye ("Dye") of Missoula, Montana.   The Court denied Harper Trust's request for judicial notice of Paul Harper's testimony of the amount of Harper Trust's attorney and expert witness fees and costs, as set forth in its Order entered on (Docket No. 316)[2].   Creditor AG Sales, which had filed objections to confirmation of Debtors' prior plans, did not file a further objection and did not appear[3].   The Chapter 12 Trustee James Volk ("Volk") appeared and voiced his strong support in favor of confirmation.   With the agreement of counsel the Court stated that all prior testimony and exhibits from the hearings held in this case on September 21-22, 2006, October 31, 2006, and May 10, 2007, are part of the record[4].

At the conclusion of the hearing, the Court closed the record and granted the parties additional time to file briefs, after which the matters of confirmation and adequate protection would be deemed submitted and taken under advisement.   On August 30, 2007, the Court entered an Order (Docket No. 316), which directed that $175,000.00 in proceeds from the sale of 20 acres of Debtors' real property be remitted to Harper Trust's counsel as a partial distribution on its secured claim, without waiver of Harper Trust's rights or arguments, and with all valid liens

---

[2]Harper Trust has not filed any applications for fees and costs under 11 U.S.C. § 506(b), as required by Mont. LBR 2016-1(d).  Reasonable amounts of Harper Trust's fees still remain to be determined by the Court under the analysis set forth *In re Kord Enterprises II*, 139 F.3d 684, 687, 689 (9th Cir. 1998).  Such matters are not judicially noticed facts as defined at Fed. R. Evidence 201(b).  *See* Order, Docket No. 204.

[3]Debtors filed stipulations with Valley Bank of Hot Springs and Valley Bank of Arlee prior to the hearing, which have been approved.  A stipulation between Debtors and Missoula Federal Credit Union ("Missoula FCU") (Docket No. 318) was filed and approved by Order entered on September 6, 2007.

[4]Docket No. 205 includes the Court's findings of fact from the October 31, 2006, confirmation hearing.

to attach to the remaining proceeds[5].

      This Court has jurisdiction of these Chapter 12 bankruptcy cases under 28 U.S.C. § 1334(a).  This is a core proceeding involving confirmation of a plan under 28 U.S.C. § 157(b)(2)(L).  The parties' memoranda have been filed and reviewed by the Court together with the record and applicable law.  Case No. 05-65161 filed by Jeffery and Shoni Lee Card ("Shoni") began on October 15, 2005, and the record reflects extended contested hearings on confirmation, conflicting expert testimony, and numerous amendments to Debtors' plan.  The latest objections by Harper Trust are based on 11 U.S.C. § 1225(a)(5)(B), lack of adequate protection under 11 U.S.C. § 1205(b) and Debtors' use of Harper Trust's cash collateral from the sale of 20 acres of property without its consent[6].  After review of the memoranda, record and applicable law, for the reasons set forth below this Court overrules Harper Trust's objections to confirmation.  The Court will direct Debtors to file a Final Amended Chapter 12 Plan incorporating the numerous stipulations with creditors, correcting typos, moving back expired 2007 payment date and adjusting Harper Trust's allowed secured claim to reflect the $175,000 partial distribution and sale ordered by the Court, upon the filing of which this Court will enter an Order confirming Debtors' Final Plan.  This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

---

     [5]Deschenes stated the amount of sale proceeds remaining after commissions and closing costs as $259,000.

     [6]Harper Trust's latest objection to confirmation (Docket No. 313) includes prior objections such as insufficient interest rate, lack of good faith and lack of eligibility for Chapter 12, some of which have been decided earlier.  Harper Trust failed to present any evidence at the hearing and failed to pursue those objections in its post-hearing brief, and they are deemed waived.

## PROCEDURAL HISTORY[7]

Jeffery Wilson and Shoni Card filed a joint Chapter 13 bankruptcy petition on October 15[8], 2005, and filed their Schedules and Statements on November 4, 2005. Schedule A lists real property described as a "Ranch/Residence located at 25195 Hwy 200 E., Potomac, Missoula County, Montana" valued at $400,000 encumbered by a secured claim in the amount of $500,000, which Schedule D identifies as held by creditors "Paul & Linda Harper" dated 1/03 and described as a contract for deed. AG Sales is listed on Schedule D as a creditor with a claim in the amount of $28,120.00 secured by a construction lien on "Ranch/Residence (Installed Pivot)", but listed as fully unsecured based upon the existence of superior liens. Their Statement of Financial Affairs at paragraph 18 lists "Wilson Scotch Cap Angus, LLC" as a cattle ranch business beginning in 2002. Jeffery testified that he is sole member and shareholder of the LLC.

Jeffery and Shoni moved to convert their case from Chapter 13 to Chapter 12, which was granted by Order entered on November 7, 2005.[9] Jeffery and Shoni substituted Deschenes as their attorney of record in March of 2006 and were granted an extension of time to file their Chapter 12 Plan, the first of which they filed on March 27, 2006. Jeffery and Shoni have filed

---

[7]A more complete procedural history and recitation of facts is set forth in this Court's Order, including findings of fact and conclusions of law, entered on February 7, 2007 (Docket No. 205). Those findings of fact and conclusions of law hereby are incorporated by reference as though set forth in full herein, and the procedural history and facts discussed herein will not repeat the earlier findings except where deemed necessary and appropriate.

[8]Jeffery and Shoni's petition date was prior to October 17, 2005, the effective date of the amendments to the Bankruptcy Code made by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

[9]Chapter 12 was reauthorized by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Pub. L. 109-8, effective October 17, 2005.

several amended Plans, the latest their Sixth Amended Plan on July 26, 2007, Docket No. 293.
The only objections to confirmation of the Sixth Amended Plan were filed by Harper Trust,
which also filed its pending motion for adequate protection, Docket No. 279, to which Debtors
have no objection.

Wilson Scotch Mountain filed its Chapter 12 petition and initial Plan in Case No. 06-
60369-12 on May 24, 2006[10], and filed its Schedules and Statements on June 15, 2006.  Its
Schedules list real property described as a "ranch/residence located at 25195 Hwy 200 East
Potomac, Missoula, Montana" valued at $400,000, and the Harper Trust's secured claim listed as
$500,000, with $100,000 unsecured.  Jeffery and Shoni are listed as codebtors on Wilson Scotch
Mountain's Schedule H to Harper Trust.  The Statement of Financial Affairs states at paragraph 1
that Wilson Scotch Mountain had $0 annual income in 2004, 2005, and to date in 2006.
Paragraph 18 states that Wilson Scotch Mountain began in existence in 2002.  Paragraph 21
states that Wilson Scotch Mountain is 100% owned by Jeffery.  Wilson Scotch Mountain did not
file Schedules I and J, but filed a "Business Income and Expenses" sheet showing estimated
gross monthly income in the amount of $4,166.00, or $50,000 per year from lease income, and
expenses of $862.67.  Wilson Scotch Mountain amended its Schedule G on June 21, 2006, to list
the unexpired cash lease of land to Jeff Wilson and Shoni Card for pasture and haying land, dated
2/1/2005[11].

The first scheduled hearing on confirmation and other matters was vacated and held on

---

[10]After enactment of BAPCPA.

[11]A contract for deed on the original Schedule G with the Harper Trust was deleted from
Wilson Scotch Mountain's amended Schedule G.

September 22, 2006, after which the Court entered an Order denying confirmation of Jeffery and Shoni's Second Amended Plan, with the agreement of Debtors' counsel, and granting Debtors additional time to amend.  Jeffery and Shoni filed their Third Amended Plan on October 11, 2006, the same date Wilson Scotch Mountain filed its Second Amended Plan.  Objections to confirmation were filed by Harper Trust in both cases, and by AG Sales, Valley Bank and Missoula FCU in Case No. 05-65161-12.  The objections of Valley Bank of Arlee, Valley Bank of Hot Springs and Missoula FCU were cured by stipulations with Jeffery and Shoni, which were followed by subsequent stipulations between the same creditors, leaving only the objections to confirmation of Harper Trust and AG Sales to be decided.

On October 19, 2006, Debtors filed an objection to AG Sales Proof of Claim No. 2 and a motion for valuation of AG Sales' security, Debtors' farm and ranch property, seeking a determination that no equity exists securing AG Sales claim[12].  These Chapter 12 cases were consolidated for purposes of joint administration[13] by Order entered on November 1, 2006, after Harper Trust withdrew its objections.

The Harper Trust filed the only Proofs of Claim in the Wilson Scotch Mountain case No. 06-60369-12.  Dye filed Proof of Claim No. 1 on behalf of the Harper Trust on August 8, 2006, asserting a claim in the amount of $527,174.11, including prepetition attorney fees in the amount of $11,849.27, and asserting that the value of the Harper Trust's collateral, real estate, is $550,000.  On October 30, 2006, Harper Trust filed Proof of Claim No. 2, checking the box

---

[12]The objection and motion for valuation are based on a valuation of $550,000.  The Debtors later stipulated a value of $600,000 for their farm and ranch property.

[13]The Order clarified that the consolidation was for joint administration but not for purposes of substantive consolidation.

6

which states that it amends a previously filed claim, and changing the value of its collateral to

"unknown".  Wilson Scotch Mountain filed an objection to Proof of Claim No. 1 on October 30,

2006, on the grounds Harper Trust's attorney fees have not been approved by the Court, and also

filed on the same date a motion for valuation of Harper Trust's security asserting the same value

for Debtor's real estate, $550,000.  Harper Trust responded to Debtor's motion for valuation on

November 13, 2006, alleging that the value of its real estate collateral is $700,000.  In Case No.

05-65161-12, Harper Trust filed Proof of Claim No. 9, and filed an amended claim on August 9,

2006, asserting an unsecured nonpriority claim in the amount of $512,730.24 for money loaned.

Debtors filed an objection and set the matter for hearing.

At a hearing held on December 7, 2006, on valuation and Debtors' objections to claims,

the parties stipulated that the value of the Harper Trust's security is $600,000.  The Court's Order

entered on December 8, 2006 (Docket No. 191), found that the Debtors' objections to Harper

Trust's and AG Sales' Proofs of Claim were resolved and directed AG Sales and Harper Trust to

file amended claims.  The Order states:

> Counsel for the parties agreed that the Debtor's real property should be valued at
> the amount of $600,000.00.  Debtors Jeffery Paul Wilson and Shoni Lee Card
> appeared and stated on the record that they agreed with the valuation of the real
> property at $600,000.00.

* * * *

> **IT IS FURTHER ORDERED** Debtor's motion for valuation of the
> Harper Trust's security . . . is resolved by settlement; and the valuation of
> Debtor's farm and ranch property located in Missoula County, Montana, securing
> the Harper Trust's claim is fixed in the amount of $600,000.00.

No request for relief from or clarification of the Court's Order fixing the valuation of Harper

Trust's security has ever been filed, and the valuation of Harper Trust's security remains

7

$600,000.

Harper Trust filed Proof of Claim No. 3 in Case No. 06-60369-12 on December 13, 2006, stating the value of its collateral at the agreed $600,000. Debtors renewed their objection to Harper Trust's claim on December 20, 2006, because of the lack of accounting for the $11,849.27 in prepetition attorney fees[14]. AG Sales filed a fourth amended Proof of Claim on December 11, 2006, asserting a secured claim in the amount of $27,955.60 plus interest, attorney fees and costs bringing the total to $41,331.52[15]. Debtors filed a subsequent objection to AG Sales' amended claim on December 21, 2006. After a hearing, on March 13, 2007, the Court sustained the Debtors' objection to Harper Trust's amended claim in part and overruled it in part by Order (Docket No. 227) and memorandum[16].

On July 5, 2007, Debtors filed a motion for sale of 20 acres of real property free and clear of liens, which was heard on July 12, 2007. The Court granted Debtors' motion at the hearing

---

[14]Paul Harper, the trustee of the Harper Trust, testified at the May 10, 2007, confirmation hearing that its attorney fees and fees for expert witnesses now total $81,481 and are ongoing. However, Harper Trust has never filed an application for professional fees and costs as required by Mont. LBR 2016-1(d). The Court denied Harper Trust's request for judicial notice of Paul Harper's testimony regarding its post-petition professional fees.

[15]At the May 10, 2007, hearing AG Sales attorney stated that AG Sales needed to update its attorney fees. Like Harper Trust, however, AG Sales has never filed an application for professional fees and costs, nor has AG Sales updated its attorney fees since the hearing. In addition, Ag Sales did not file an objection to confirmation of Debtors' Sixth Amended Plan which treats Ag Sales as a secured creditor, even though Ag Sales' owner Clyde Hepburn testified on October 31, 2006, that it has the ability to disassemble, retrieve and resell the pivot system it sold to Jeffery, and that removal would not result in any permanent damage to Jeffery's property. This calls into question whether Ag Sales collateral is a fixture to the property. Docket No. 205, p. 10.

[16]The Court allowed Harper Trust's prepetition attorney fees and costs in the reduced amounts of $10,635.00 and 366.77, respectively.

and an Order was entered on the Docket, No. 289.

Debtors filed their Sixth Amended Chapter 12 Plan (Docket No. 293), with Ex. 1 attached, on July 26, 2007.  On July 27, 2007, based on Debtors' Sixth Amended Plan the Court denied confirmation of Debtors' Fifth Amended Plan.  The hearing on confirmation and Harper Trust's objection thereto and motion for adequate protection was set for August 30, 2007, after which the Court ordered that Harper Trust be paid $175,000 in proceeds from the sale of the 20 acres as a partial distribution, without waiver of any of its rights.

## FACTS

Jeffery Wilson and Shoni Lee Card are married and have two sons.  Jeffery grew up on a cow/calf ranch operation raising cattle and was educated through graduate school in animal science.  Shoni was educated and has 18 years experience as a veterinarian, and is employed as a full-time veterinarian at Pruyn Veterinary clinic in Missoula with a mixed animal veterinary practice.  Jeffery was injured years ago in a scaffolding accident, and testified that he receives workers' compensation payments in the amount of $2,088.09 per month with a five percent (5%) annual increase, and an annual $5,000 balloon payment from insurance.

Jeffery grew up working and raising Hereford cattle, but since 1996 he has operated a purebred registered Angus cattle operation, starting with 13 cows in 1997 and growing his herd since by means of embryo transfer, and raising elite Angus bulls.  Prior to purchasing land from the Harper Trust at Potomac, Montana, Jeffery rented land for his cattle operation at Florence and Pablo, Montana.

On January 2003 Jeffery, on behalf of Wilson Scotch Cap Angus, LLC, entered into Ex.

9

H-03[17], a contract for deed with Harper Trust for the purchase of 3 parcels of real property in Missoula County, Montana[18]. The property consists of 231 acres, of which 190 acres are irrigated. Jeffery testified that he uses the land for both pasture and hay. Jeffery testified that when he purchased the property it had been on the market for two and one-half years, and that most of the property lies on a flood plain. The purchase price of the property on Ex. H-03 was $575,000, payable at an interest rate of 5.75% per annum with a $50,000 down payment and annual payments until a balloon payment became due on February 15, 2006.

After Jeffery and Shoni filed their bankruptcy petition, in February 2006 they paid Harper Trust about $18,000, Shoni testified. Jeffery admitted that he testified at his 2004 examination that Wilson Scotch Mountain's real property purchased from Harper Trust has a value range of from $400,000 to $700,000, with the lower value based on a two-week sale. He testified that the sale of 20 acres did not change the value of his remaining property, and that it remains worth $700,000.

Jeffery purchased an irrigation system from AG Sales in October 2003, and purchased a pivot in May of 2004, but testified that AG Sales delayed making the pivot operational until the following August causing him to lose more than a full year's hay crop at a dollar loss of between $9,000 to $10,000. Shoni testified earlier that no payment was made to AG Sales on the pivot by Debtors. But AG Sales gave Jeffery credit for payments, leaving a balance due in the amount of

---

[17]Attached to Docket No. 103.

[18]The complete legal description of the real property is described in full at pages 1 through 4 of Ex. 1 admitted at the March 2007 confirmation hearing. The property consists of 3 parcels of real property located in portions of Sections 5 and 8, Township 13 North, Range 16 West, P.M.M., including a 30 foot wide private road and utility easement.

$28,164.60 as of 9/28/2004. AG Sales admitted that when it sold the pivot system to Jeffery it intended that it remain part of the real property. Jeffery tried to obtain financing for the pivot system but identity theft had affected his credit. He also had a cost sharing arrangement for the purchase of the pivot system with DNRC, but he could not get payment from DNRC before the pivot system was up and running.

AG Sales prepared and filed a construction lien against Wilson Scotch Cap Angus Ranch's real property at Potomac for the center pivot, services and materials, pumps, controls, valves and pipe. AG Sales' owner Clyde Hepburn testified that it has the ability to disassemble and retrieve the pivot system it sold to Jeffery at a cost of $3,250, and that removal would result in no permanent damage to Debtors' property except leaving a concrete pad which could accommodate another irrigation system. Hepburn testified that it can easily resell the used pivot, and has sold used pivots before. Shoni testified at the May 10, 2007, confirmation hearing that the pivot system was not operational last fall when it was shut down, and had not yet been started this year.

Debtors' Third Amended Plan included a budget for operation for 2007 and typical, admitted at a prior hearing, showing total annual "crop income" of $111,950 and off-farm income of $95,000. Debtors' Fourth Amended Plan showed total crop income of $161,800. Their Fifth Amended Plan on Ex. 2 shows total crop income of $125,100 with the same off-farm income of $95,000, for a total income of $220,100 less operating expenses of $116,700 for a net farm income on Ex. 2 of $103,400 for a typical year, which are the same figures on the typical year budget on the fifth page of Ex. 1 attached to the Sixth Amended Plan.

The Fifth Amended Plan shows total income from Debtors' cattle operations in the

11

amount of $308,145, including cash on hand of $5,500 on Ex. 2, third page.  Of the $308,145 in total income on the third page of Ex. 2, ranch operations, $200,000 is from the proposed land sale of 20 acres at $10,000 per acre.  Debtors' expert J. T. Korkow ("Korkow") earlier testified that he updated the beginning cash figures from Ex. 2.  Specifically, Korkow testified that Jeffery did not earn $71,145 net from his March 2007 bull sale as stated on the third page of Ex. 2, but instead netted approximately $41,000 from bull sales and another $18,700 worth of high pedigree heifers which Jeffery obtained in a barter exchange, instead of cash, for his bulls.

The Sixth Amended Plan, Jeffrey testified, included updated beginning cash flows at Ex. 1, third page, resulting from the land sale, with cash on hand increased to $53,500, bull sale income reduced to $6,975, heifer income eliminated, and total income increased to $335,475. Accounts payable were increased to $38,065 mostly from land sale expenses, and total beginning cash on the third page of Ex. 1 became $297,410.   Jeffrey testified that otherwise there were no changes in their budget from the Fifth Amended Plan to the Sixth Amended Plan.

Ex. H-35[19] is information sent by Deschenes to Dye from the March 2007 sale, showing gross sales of angus bulls of $53,100 with one check to Jeffery and Valley Bank in the sum of $31,391.16 after sales expenses and commissions, and a second check for net proceeds in the amount of $9,461.80 made out to Jeffery and Valley Bank.

The expenses on the second page of Ex. H-35 include two entries described as "A/R Harrison" and "A/R Windhill" in the amounts of $950.00 and $10,000.00, respectively, which Korkow explained were accounts receivables owed to Jeffery, not debts.  Two other "A/R" entries for M. Harrison ($1,750) and "Schristensen" ($6,000) listed on the last page of Ex. H-35

---

[19]Attached to Docket No. 248.

bring the total A/R to $18,700.  Under examination by the Court regarding the Windhill $10,000

A/R, Korkow testified that it is really a $4,000 receivable, with a barter agreement between

Jeffery to trade heifers for bulls with a value of another $6,000.  Under questioning from the

Court Shoni testified that the Windhill exchange was how Jeffery obtained two special purebred

heifers which is a component of his specialized breeding program.  Korkow testified that the

Harrison $950 A/R on Ex. H-35 should read  $1,300 in a trade for a bull, but Korkow reiterated

that $18,700 in total A/R on Ex. H-35 remains to come in.

 Shoni testified on cross examination and clarified that the A/R accounts have been paid.

She testified that the two Harrison A/R accounts, $950 and $1,750, were paid by giving Jeffery

$1,300 worth of hay, and $1,400 in cash which is in the Valley Bank account.  She testified that

the "SChristensen" A/R of $6,000 was paid off as part of the check for $9,461.80 which was

received and deposited into the bank account.

 Korkow testified that Debtors had a sale of 25 heifers pending, not 21 as stated on the

third page of Ex. 2.  Korkow testified that Jeffery had 25 heifers sold to Vannoys, from whom the

Debtors are leasing pasture, and that he has seen a bill of sale and brand certificates for the 25

head, but that no cash has changed hands and the parties are holding the documents and those

animals are "still in the mix".

 Brand inspector Hall testified regarding Ex. H-40, a State of Montana brand certificate

and bill of sale listing 25 head of cattle sold by Jeff Wilson to Rod & Tom Vannoy on 4-14-07.

Hall testified that he signed Ex. H-40 after being approached by Jeffery and Vannoy to inspect

the 25 head for change in ownership.  Hall testified that as far as he knows the title to the 25 head

was transferred to Vannoys and the sale is "a done deal".  But, Hall testified that if the check

13

bounces the cattle would have to come back to the seller, and that if Jeffery were to buy back the 25 head he would need to obtain new brand certificates. On rebuttal Shoni testified that no money has changed hands and the sale of 25 heifers to Vannoys has not been completed. She testified that the agreement with Vannoys is that they will purchase 25 heifers from Jeffery at $1,500 per head, but Jeffery will continue to run the heifers until the fall of 2008, at which time Vannoys will keep thirty percent (30%) of the calf crop from the heifers along with the 25 head, and Jeffery will get 70% of the heifers. Shoni testified that the agreement with Vannoys helps Debtors' cash flow, and that Vannoys will pay Jeffery $1,500 per head for the 25 heifers "soon."

Korkow updated the cash on hand, testifying that Debtors' cash on hand was $13,000 on the day before the May 10, 2007, confirmation hearing, rather than $5,500 as stated on the third page of Ex. 2, not including bull sale income, but including a $9,000 tax refund from Shoni's withholding and offsets. Korkow testified that Debtors had about $41,000 in proceeds from the March 2007 bull sale on deposit at Valley Bank.

Ex. 2 attached to the Fifth Amended Plan, on the third page, lists 51 bulls with a price per unit of $1,395, and $1,600 per bull for the typical year on the fifth page. Jeffery earlier testified that he sold bulls in 2005 at private treaty sales for an average price range of between $2,500 to $2,600 per bull, and that he had 64 head of cattle ready for the March 2007 sale, which he agreed to participate in and advertise for at Korkow's suggestion. Debtors' Third Amended Plan projected a sale price for bulls at $2,000, which Jeffery testified was the national average sale price, but he expected that his bulls would sell for $2,500 at the March 2007 production sale. The March 2007 sale brought in far lower prices for bulls than Jeffery projected.

The typical year projections attached to the Fifth Amended Plan, fifth page of Ex. 2, and

the projections for the Sixth Amended Plan, fifth page of Ex. 1, state 53 bulls available for sale at a unit price of $1,600. Korkow testified that Jeffery received an average of $1,400 per bull and liquidated all his bulls at the March 2007 sale, and sold some bulls for as little as $700 or $800 per head. Ex. H-35 indicates that at least fourteen of Jeffery's bulls sold for more than the typical projected $1,600 unit price, including one which sold for $4,000 and another for $6,000. The third page of Ex. H-35 includes one angus bull sold for $500, and another sold for $675. Korkow testified that the $1,600 per bull unit price in the Fifth Amended Plan's projections is realistic and that Jeffery could have realized that unit price if he had pulled his bulls out of the March 2007 sale and sold them at private treaty sales. Jeffery testified that he can meet his projected $1,600 price per bull unit.

The beginning cash operations budgeted on Debtors' Fifth Amended Plan shows a heifer sale of 21 heifers at $1,500 per head, which were removed from the beginning cash on the third page of Ex. 1 attached to the Sixth Amended Plan. Korkow testified that the $1,500 price for heifer sale at the next sale is reflective of commercial values because the cattle market is moving higher. The typical year budget attached to the Fifth and Sixth Amended Plan, fifth page of Ex. 2 and Ex. 1, lists the unit price for replacement heifers as $1,000.00. Korkow testified that the sale of 21 heifers will be to Vannoys, from whom Debtors are leasing pasture. Additional income in the budget was projected by Korkow to come from the sale of cull cows, bulls and steers in the fall.

Ex. 1 attached to the Sixth Amended Plan, third page "Beginning Cash", differs from Ex. 2 at the third page by omitting the sale of 21 heifers. Jeffery testified that those heifers have not been sold, still have their eartags and have all been bred, so that Debtors still have that value

15

represented by those heifers to incorporate into their herd.

Korkow testified that the beginning cash flow for operations on the third page of Ex. 2, listing $308,145 in total income and $37,465 in payables for total beginning cash of $270,680, reflects only the expenses through July 16, 2007, when the land sale was first proposed to be completed. Korkow testified that accounts payable on the projections for the Fifth Amended Plan are stated as $37,465 including $13,000 projected land sale expenses. The Sixth Amended Plan increased those projected land sale expenses on the third page of Ex. 1 to $18,100.

Korkow admitted that there will be additional 2007 expenses in the fall, and that he used an unstated fiscal year period for Debtors' projections from May to April 30 of each year to reflect Debtors' debt payments made in April of each year. One such additional expense on the fourth page of Ex. 2, the operations expense, is $22,000 in land rent. Korkow testified that the $22,000 represents two lease payments to Vannoy, which he admitted had not been paid as of the March 30, 2007, hearing. At the May 10, 2007, hearing Shoni testified that the Vannoy lease for 2007 in the amount of $20,000 still has not been paid and is still owing but not yet due, as is another $2,000 in rent for a small pasture for heifers. She testified that Debtors have $20,000 to make the lease payment to the Vannoys. At the hearing on August 30, 2007, Jeffery testified that he still had not paid all of the Vannoy lease payment.

The cash flow on the first page of Ex. 2 shows balance available, directly below cash carryforward, of $103,400 for each of the years 2008 through 2013, which Korkow testified was taken from the typical year budget for Jeffery's cattle operation on the fifth page. Ex. 1 reflects no change for those numbers on the Sixth Amended Plan, first page. However, the number for net cash at the end of 2007 on the first page of Ex. 1 changed for 2007 to $28,388, a decrease

16

from Ex. 2's net cash for 2007 of $35,354, then increases to $61,495 in 2008 and $94,601 in 2009.  The 2008 ending cash on the first page of Ex. 2, by contrast is $35,103.  A notable difference between the 2008 cash flow on the first pages of Ex. 1 and 2 is an estimated capital gains tax liability of $31,000 on Ex. 2 directly beneath the $103,400 "balance available", which is missing from the 2008 cash flow on Ex. 1.  Korkow testified that the capital gain liability calculated on a per acre basis and 25 percent (25%) capital gain would result in a $34,000 capital gains tax liability.  The corresponding attachments to the Sixth Amended Plan on the first and seventh pages of Ex. 1, cash flow for operations and proposed land sale for paydown, contain no treatment for payment of capital gains tax from the land sale, and no testimony was offered explaining the change.

Korkow earlier testified that the Debtors' cattle income has not changed, but that Debtors' off-farm income increased from $85,000 to $95,000 to conform with Debtors' actual performance.  Korkow testified at the May 10, 2007, hearing that the Debtors' off-farm income had stayed the same.  He specified that Debtors received tax refunds and revenues from Shoni's puppy sales in their off-farm income, and further testified that Jeffery's workers' compensation increases by 5% in February 2007 to $2,193 per month.  Shoni testified that Debtors can earn $95,000 in off-farm income, which is reflected on the fifth page of Ex. 1.  She testified that Jeffery's off-farm income is about $30,000 per year, and that her take home pay as a veterinarian and miscellaneous income is about $65,000[20].  At the May 10, 2007, hearing Korkow testified that Debtors' non-farm income from Jeffery's workers compensation and Shoni's net veterinary

---

[20]Shoni testified that her take home pay from her veterinary practice is $56,000.  The other $9,000 is from miscellaneous income.

17

income total $95,000, and they received an additional $9,000 tax refund from withholding and offsets which Korkow described as "gravy". Shoni testified at the May 10, 2007, confirmation hearing that her income and expenses are close to the same as before.

Jeffery and Shoni's annual living expenses were set at $25,000 in their Third Amended Plan, and they remain $25,000 on the fourth page of Ex. 1 of the Sixth Amended Plan. Shoni testified that she prepares the Debtors' monthly operating reports, and that their projections are based on their historical expenses and tax returns, arrived at after discussing their expenses with Korkow. Their living expenses include no payment for housing or utilities because those are included in the farm operating expenses in addition to heating fuel and expenses.

Korkow testified earlier that he determined Debtors' operating costs from their tax returns, operating reports and interviews. Ex. 1 and 2, fourth page, lists total farm operating expenses as $91,700. Ex. 2 had increased Debtors' "auto and advertising expense" to $5,000, but otherwise the farm operating expenses did not change. Operating expenses admitted at prior hearing total $114,200, of which Korkow testified that approximately $30,000 is attributable to family living expenses paid for by Jeffery's ranch operations. On Ex. 1 and 2, fourth page, the total expenses are stated as $116,700. Jeffery and Shoni both testified that they can live and operate within their budget projections.

Wilson Scotch Mountain's Second Amended Plan proposed payments in the amounts of $55,055.75 on December 31, 2007; $48,176.65 on December 31, 2008; and $48,176.65 on December 31, 2009, all from annual lease income of $64,000. Jeffery and Shoni's Third Amended Plan provided for payments in the amounts of $50,693.68 on December 31, 2007, $23,062.16 on December 31, 2008, and $23,062.16 on December 31, 2009. Numerous

18

Stipulations between the Jeffrey and Shoni, Valley Bank and Missoula FCU, which were approved by the Court and incorporated into any Chapter 12 Plan proposed by the Debtors, modified treatment of each of their claims.

Debtors' Fifth Amended Plan provided for payments to the Trustee in the sum of $235,326.00 on July 16, 2007, $72,652.00 on April 15, 2008, and $72,652.00 on April 15, 2009. Shoni testified that she worked on the budgets attached to the Fifth Amended Plan with Korkow, and that she was comfortable they can make the plan payments. The Fifth Amended Plan first proposed a sale of 20 acres of property to net not less than $150,000.00 to Harper Trust by July 16, 2007, or Harper Trust would be entitled to a lifting of the stay. The 20 acres was later sold for $275,000 after notice and a hearing, and Harper Trust was paid $175,000 as a partial distribution.

The Fifth Amended Plan treated the Harper Trust's claim as secured by land with a value of $575,000.00, amortized over 30 years with a 5 year balloon, at an interest rate of 8.5% per annum, with $150,000 due from the sale of 20 acres no later than July 16, 2007, and annual payments in the amount of $39,546.00. AG Sales was treated as secured by property valued at $36,942.00 payable over 15 years with a 7 year balloon, $2,500.00 due by July 16, 2007, at an interest rate of 8.5% and annual payments of $4,419.00. Paragraph 3 provided that the executory leases with Farm Service Agency, and a lease with Tom Vannoy, are affirmed, and that provision remains in the Sixth Amended Plan.

The Sixth Amended Plan provides for payments to the Trustee of $269,021.74 on September 15, 2007, $70,293.57 on April 15, 2008, and $70,293.57 on April 15, 2009. The Sixth Amended Plan treats the Harper Trust's claim as secured by land with a value of

19

$575,000.00, amortized over 30 years with a 5 year balloon, at an interest rate of 8.5% per annum, with $175,000 due from the sale of 20 acres no later than September 15, 2007, and annual payments reduced to $37,220.00 after the payment to Harper Trust of $175,000. AG Sales is treated as secured by property valued at $39,425.00 payable over 15 years with a 5 year balloon, $2,500.00 due by September 16, 2007, at an interest rate of 8.5% and annual payments of $4,447.00. Deschenes advised the Court that the September 16, 2007, payment dates for Missoula FCU and Valley Bank's loan secured by cattle should read September 15, 2007. Jeffery testified that there are no additional land sales contemplated in their Sixth Amended Plan.

**Korkow's Expert Testimony.**

J. T. Korkow of Powder River Ag Consulting, LLC, is an agricultural consultant employed by the Debtors in March of 2006 to consult on their reorganization and testify at confirmation. Korkow testified at the prior confirmation hearing that he is experienced in and familiar with agricultural lending, and that the proposed 7% interest rate provided in Wilson Scotch Mountain's Second Amended Plan for the Harper Trust's secured claim, which this Court rejected under longstanding case authority in Docket No. 205, was appropriate.

Korkow previously testified that Jeffery and Shoni's non-farm income subsidizes their operating income, and he admitted that Debtors' bull operations will continue to lose money. Korkow explained that Jeffery and Shoni's non-farm income will cover the Debtors' expenses until the March 2007 sales of 2-year old bulls. At the May 10, 2007, confirmation hearing the evidence showed that the March bull sale brought in far less than projected, while Shoni's off-farm income stayed the same after increasing earlier in the case. Korkow testified that Debtors' off-farm income consisting of Jeffery's workers compensation payments and an annual insurance

20

balloon  and Shoni's income as a veterinarian, which can cover the losses and plan payments, and also that Jeffery intends to increase the size of his herd in order to produce more revenue from bull sales.  Korkow testified that Korkow testified that Jeffery is improving his crop base and that the pivot irrigation system purchased from AG Sales is essential.

Korkow testified earlier that in his expert opinion Debtors' Plans were feasible based on Debtors' combined farm and personal incomes.  With respect to Debtors' Fifth Amended Plan, Korkow again testified that the Plan is feasible, and that as a lender he would consider the Debtors creditworthy because, he asserted, they have a history of making payments.  Korkow testified that the 8.5% interest rate for Harper Trust's and AG Sales' claims includes a sufficient one-quarter percent (1/4%) risk factor, based upon the increased value of the property when selling the 20 acres for development, and because Harper Trust has no cost-of-funds factor to consider.  The 8.5% interest rate remains on the Sixth Amended Plan's treatment for Harper Trust and Ag Sales, and no testimony was offered to contradict Korkow's earlier testimony in support of 8.5%, and no testimony was offered that the Sixth Amended Plan does not pay the present value of Harper Trust's allowed secured claim.  Korkow testified that Debtors estimated their attorney fees for Deschenes on the cash flow projections at $45,000.00, but that after learning of Deschenes $17,000 retainer the $45,000 for Deschenes' attorney fees should be reduced to $36,000.  The first page of Ex. 1 raised Deschenes fees to $50,000.

**Jack Wicks' Expert Testimony.**

Jack Wicks ("Wicks") is an experienced agricultural expert in Montana, former county extension agent and economist, real estate appraiser, and experienced in farm and ranch management who has testified in numerous Montana bankruptcy cases as an expert witness over

21

several years.  Wicks testified at the October 31, 2006, confirmation hearing, after reviewing

Debtors' prior Plans, and he prepared an analysis which was admitted into evidence as Ex. H-24.

In preparation of Ex. H-24, Wicks testified that he relied on Jeffery's beginning cattle inventory

of 84 cows from his May 2006 Rule 2004 examination.

Wicks testified that cattle prices were at that time at the top of the market cycle, which

typically reflects a 5-year upswing in prices followed by a 5-year decline.  In 2007 and

subsequent years Wicks predicted a decline in the number of bulls Jeffery will have available for

sale, and predicted a drop in the price per pound Jeffery will realize for his male and female culls.

Some of the results of the March 2007 bull sale tend to corroborate Wicks' opinion, but other

sale prices on Ex. H-35 support Jeffery's claim that he can sell bulls for premium prices.

Jeffery and Korkow both disagreed with several of Wicks' assumptions and conclusions

at the prior hearing.  Jeffery testified that he does not intend to keep his herd the same number,

and claimed that he can double his production without having to lease additional land by

fertilizing, which he had not been doing earlier.  Jeffery asserted that his practice of embryo

transfer produces better quality beef, reduces his culling rate and enables him to grow his herd.

Korkow testified that the Debtors' educational background in animal science and production

experience are above average, and therefore the local averages upon which Wicks' relied for his

assumptions do not apply to these Debtors.  Jeffery's testimony at the most recent hearing shows

that he is growing his herd by retaining and breeding his heifers.

Wicks testified that he has developed Chapter 12 Plans, and that they are generally

"extremely tight if they work at all."  Wicks' projected cash flow of the Debtors' earlier

combined operations showed a loss in cash carryover in the amount of $29,902 after 2007, with

increasing losses in each succeeding year.  However, Wicks did not appear at later hearings and explain the effect of the sale of 20 acres on his opinion.

**Walker's Expert Testimony.**

Shirlee Walker ("Walker") is a certified public accountant ("CPA") and fraud examiner with 25 years experience in cash flow analysis, and an MBA in tax.  Walker testified earlier that she performed cash flow analyses of the Debtors' Plans after comparing their projections with the Debtors' actual expenditures from their monthly operating reports.  Walker concluded that Debtors' expenses far exceeded their income.  In particular Walker noted the Debtors' 8-month repair and feed expenses exceeded the earlier Plan's budget for those items.  Walker concluded from Ex. H-26 that the Debtors lacked adequate income and cash on hand to pay their expenses incurred for the first three months of 2007 when their average expenses are higher than later in the year.  Walker also prepared Ex. H-27, which compared the cash flow under Debtors' earlier revised Plans in 2007 with their cash flow if the interest rates on the secured claims are set at the prime rate, prime plus 1, prime plus 2, and prime plus 3.  Ex. H-27 reflected that, treating Harper Trust at the prime rate of interest, the net cash in the earlier Plan became a loss, which increased along with in increase in the interest rate.  In rebuttal at the prior confirmation hearing Korkow testified that Walker's testimony did not change his opinion that Debtors' Plan is feasible because their non-farm income was high enough to subsidize Jeffery's cattle operations.

Debtors' Fifth Amended Plan increased the interest rate for the Harper Trust's and Ag Sales' claims above the prime rate to 8.5%, which stayed the same on their Sixth Amended Plan. Walker testified that she prepared Ex. H-37 by comparing Debtors' actual cash expenditures from their monthly U.S. Trustee operating reports with the Debtors' projections on the fourth

page of Ex. 2, which listed their total projected expenses in the amount of $116,700.  Ex. H-37, the second column covering the actual expenses from April '06 through March '07, lists total expenses of $109,351.  The third column lists additional payments for legal, accounting, and credit card payments from the operating reports, and loan payments, totaling $21,481.

Walker also prepared Ex. H-38, which she testified she prepared from the Debtors' projections attached to their Fifth Amended Plan as presented prior to the May 10, 2007, confirmation hearing.  The first column of Ex. H-38 corresponds to the operation income and accounts payable from the third page of Ex. 2, and Walker testified that the "Actual" column on Ex. H-38 was derived from adjustments from the Debtors' U.S. Trustee monthly operating reports.  The operating income Walker arrived at on Ex. H-38 is $265,870, an adjustment downward of $42,275 from Debtors' projections on Ex. 2.  Walker adjusted the net cash per Plan down from $270,680 to $244,705, to reflect what was paid from the proceeds of the cattle sales according to the information provided by the Debtors before the May 10, 2007, confirmation hearing.

Ex. H-39 is an estimated 2007 cash flow which Walker testified she prepared after her adjustments reflected in Ex. H-38, plus the net bull sale check and estimated proceeds from an earlier proposed land sale, less adjusted accounts payable, and arrived at estimated cash as adjusted in the sum of $213,205.  From that Walker deducted $209,500 in payments required and Debtors' estimated attorney fees and showed net cash after the land sale of $3,705.  To that $3,705 Walker added the projected heifer sale revenue and off-farm income from Ex. 2 to arrive at 2007 estimated operating cash in the amount of $130,205 on Ex. H-39.  From that total Walker deducted Debtors' projected expenses, payment to Powder River Ag and 2007 Chapter 12

24

Trustee expenses from the first and fourth pages of Ex. 2, totaling $142,526, with a resulting 2007 net cash flow loss of $12,321 shown on Ex. H-39. Walker testified that she then further adjusted the cash flow to reflect Debtors' projected $1,000 sale price for heifers[21], which increased the Debtors' 2007 cash flow loss to $22,821 on Ex. H-39. Walker summarized her opinion by testifying that Debtors' Fifth Amended Plan does not cash flow according to the Debtors' own numbers. Walker did not testify at the subsequent confirmation hearing on Debtors' Sixth Amended Plan.

Deschenes cross examined Walker regarding her adjustments to Debtors' projections. The projected fuel expense from the fourth page of Ex. 2 is stated as $3,000, but Walker testified that her actual fuel expense of $8,739 on Ex. 37 came from the Debtors' U.S. Trustee reports. The difference in land rent, Walker testified, reflected that the land rentals are paid by Debtors at different times. Deschenes asked Walker about her use on Ex. H-37 of the period from April 2006 to March 2007, and compared it with Debtors' typical year which he characterized as a calendar year, but Walker testified that she used a full 12-month period, and used Debtors' total projected $95,000 in off-farm income from Ex. 2, fifth page. On redirect examination Walker explained that she used a fiscal year because the Fifth Amended Plan was dated approximately the end of March 2007, and provides for payments in April of 2008 and 2009. She testified that she included all of Debtors' income and expenses in her fiscal year from the documents they provided.

Deschenes asked Walker whether the $12,321 loss on Ex. H-39 would still exist if Deschenes' retainer for attorney fees, were included, along with the accounts receivable from

---

[21]The $1,000 unit price for replacement heifers is provided at the fifth page of Ex. 2.

Harrison, Windhill and Schristensen from Ex. H-35, but Walker testified that she could not say because Shoni's testimony about the amount due from Windhill is not the same as Ex. H-35.

**Sale of 20 Acres.**

The sale of Debtors' 20 acres approved by the Court for the sum of $275,000 was approved by the Court, and Harper Trust has been paid $175,000 from the proceeds. Jeffery testified that Debtors' Sixth Amended Plan cash flows after payments to creditors, but wants to use Harper Trust's remaining cash collateral[22] for operations. Jeffery testified that he could restructure his plan in the future without use of Harper Trust's cash collateral, but he did not know the details at the latest hearing and said it would be more difficult because he was short of hay from lack of fertilizer last summer.

Shoni testified that the 20-acre parcel which they sold was surveyed before Debtors' purchased the property. She testified that sale of the 20 acres would not affect their cattle production because it is located at the end of the property on hilly ground, has never been irrigated, and its sale would not decrease their pasture or hay acreage. Jeffery testified that the sale of the 20-acre parcel would not reduce the value of the remaining property any more than the $45,000 indicated to the Debtors by their realtor Ken Allen.

**Adequate Protection.**

Jeffery testified on direct examination regarding realtor Ken Allen's earlier testimony that the loss of the value to Debtors' remaining real property after sale of the 20 acre parcel was

---

[22]Ex. 1 shows $256,900.00 remaining from the $275,000 sale price less commission and closing costs, less $175,000.00 paid to Harper Trust, leaves $81,900.00. Debtors' memorandum states at page 2 that $75,000.00 remains in escrow.

limited to a $45,000.00 write down.  Dye made a continuing objection[23] to that testimony on the grounds that Debtors had stipulated to a value of their real property of $600,000.  Deschenes responded that Harper Trust has moved for adequate protection and Debtors agree that it is entitled to adequate protection, and that Harper Trust in fact is adequately protected by an equity cushion.  Harper Trust did not offer an appraisal of its collateral, and offered no expert testimony regarding the value.

Harper Trust's objection to confirmation of the Sixth Amended Plan states that its claim totals $628,757.11, including a subtotal of $562,655.75 including interest plus approximately $70,000.00 in post-petition attorney's fees and expert fees and costs based on Paul Harper's testimony, of which this Court refused Harper Trust's request to take judicial notice.  Harper Trust has not filed an application for fees and costs based upon 11 U.S.C. § 506(b), and to date the Court has not awarded Harper Trust any post-petition fees and costs pursuant to § 506(b).  Jeffery testified that Harper Trust claims that it is owed about $635,000 including fees, which after reducing by the $175,000 partial distribution ordered by the Court is reduced to $455,000[24].  Jeffery testified that Harper Trust's remaining claim of $455,000 is secured by remaining real estate with a value of at least $550,000, or almost $100,000 of an equity cushion.

## DISCUSSION

### I.  Contentions of the Parties.

Harper Trust objects to confirmation of the Debtors' Sixth Amended Chapter 12 Plan,

---

[23]The Court overruled Dye's objection, but later stated it would reserve its ruling and noted Dye's continuing objection regarding valuation.

[24]Actually the difference is $460,000.

27

arguing that it violates the plain meaning of "§§ 1225(a)(5)(B)(i) and (b)(8)[25]".  Harper Trust contends that the Plan violates § 1225(a)(5)(B)(i) because it will not retain "the lien" on its cash collateral if Debtors are authorized to use the sale proceeds in excess of the $175,000 paid to Harper Trust for their operations.  Harper Trust cites its earlier objections to confirmation citing cases against lien stripping in chapter 12 plans, and cites *In re Stallings*, 290 B.R. 777 (Bankr. D. Idaho 2003), criticizing the decision *In re Hanna*, 912 F.2d 945, 950-51 (8th Cir. 1990) which concluded that the language "retain the lien" in § 1225(a)(5)(B)(i) could be interpreted to mean a lien on a cattle herd rather than on particular animals in the herd, where the value of the creditor's collateral adequately protected the creditor's secured claim over the course of the plan repayment period[26].

Harper Trust argues that § 1225(a)(5)(B)(i) applies notwithstanding the sale of 20 acres preconfirmation because of the specific language of paragraph 6 of the Sixth Amended Plan, and because the stated purpose of the sale was to fund the Fifth Amended Plan in their motion to sell the 20 acres[27].  Harper Trust contends that 11 U.S.C. § 1206 specifically provides that the proceeds of any sale free and clear of interests under that section "shall be subject to such

---

[25]There is no § 1225(b)(8) in the Bankruptcy Code.  Harper Trust cites language found at § 1222(b)(8), but that section lists what "the plan may" provide, not what it shall provide.

[26]The Eighth Circuit concluded in *Hanna* that the debtors' plan fell short of meeting Chapter 12's lien retention requirement, because it replaced the creditor's entire equity cushion in the herd with a second mortgage on land, which carried different risks and was less liquid than a lien on cattle for which the creditor had bargained.  912 F.2d at 952.  No such change in risk or liquidity is reflected in the instant case, where all indications are that the value of Harper Trust's remaining collateral keeps increasing.

[27]Operating expenses and accounts to be paid for Debtors' operations are specifically set forth in the attachments to both the Fifth Amended Plan (Ex. 2) and Sixth Amended Plan (Ex. 1), on the third and fourth pages.

28

interest."

Next, Harper Trust argues that it is not adequately protected, notwithstanding its first lien position and $175,000 payment of sale proceeds, because Debtors stipulated that the value of Debtors' farm and ranch property is $600,000, Debtors have not recommenced valuation proceedings so the $600,000 value is the law of the case, and Debtors have not filed a motion to use cash collateral under 11 U.S.C. § 363(c)(2)(B).  Harper Trust totals secured claims against its collateral, including that of Ag Sales[28] and $70,000 of post-petition attorney and expert fees for which no applications have been filed as required by Mont. LBR 2016-1(d), at the sum of $665,699.11.

Harper Trust notes that Debtors have the burden of proof for adequate protection under § 363(o)(1), and cites *In re WRB West Associates Joint Venture*, 106 B.R. 215, 220 (Bankr. D. Mont. 1989) that the equity cushion must be protected against erosion by interest, depreciation or other charges.  Harper Trust argues that Jeffery's and Allen's testimony on agricultural value of the 20 acres sold must be rejected because it was inconsistent with Jeffery's prior testimony and the $600,000 stipulated value, and the remaining property cannot be valued at $550,000.  Based on the stipulated value Harper Trust contends that it is undersecured, and argues that its equity cushion is not protected against interest and depreciation if the Court values the remaining property at $550,000, since based on Harper Trust's calculation of gross secured claims the equity cushion is only 3.18%, which Harper Trust contends is "plainly an inadequate 'margin for error' to constitute adequate protection."  In earlier objections to confirmation Harper Trust

---

[28]There is no dispute that Ag Sales lien against Debtors' real property, if any, is subordinate to Harper Trust's lien.  Therefore, Ag Sales' claim has no relevance to the amount of Harper Trust's equity cushion or secured status under 11 U.S.C. § 506.

argued that Debtors' March 24 production sale was a "complete flop" and produced an average of about $1,400 per head instead of the projected $2,000 to $2,500, and that their Plans were not feasible, nor is the Sixth Amended Plan.

Debtors contend that their Plan is feasible and that, because of the sale of 20 acres and payment of $175,000 pre-confirmation, Harper Trust's position was greatly benefitted and it is adequately protected, and that Debtors should be allowed to use the remaining cash collateral and their Plan should be confirmed. Debtors note that their Plan no longer contemplates the sale because the Court already approved the sale, and they seek only the use of the remaining $75,000 in cash collateral for their operations pursuant to their Plan. Debtors contend that their sale was permitted under § 1206, that they did not oppose Harper Trust's motion for adequate protection, and that the agreed $600,000 valuation did not contemplate the sale of 20 acres for $275,000.

Debtors' note Jeffery's testimony of the value of his property and Ken Allen's testimony that the sale of 20 acres reduced the overall $600,000 value by not more than $45,000, leaving $555,000. Debtors cite Harper Trust's statements that it is owed approximately $630,000, including as-yet unapproved attorney's fees, which must be reduced by the $175,000 partial distribution leaving $455,000 secured by $555,000, leaving an equity cushion of $100,000 or 22 percent (22%). Debtors argue that they satisfied the adequate protection requirement of § 1205(b) by the $175,000 cash payment and equity cushion, and that no replacement lien is necessary.

With respect to the use of cash collateral, Debtors argue that § 1222(b)(8) allows for a distribution of a part of the property, and that 11 U.S.C. § 363 allows Debtors use of the proceeds, citing *In re Indreland*, 77 B.R. 268, 272, 4 Mont. B.R. 492, 499-500 (Bankr. D. Mont.

30

1987).  Debtors also cite *In re Big Hook Land & Cattle Co.*, 77 B.R. 793, 796, 4 Mont. 523, 529-

30 (Bankr. D. Mont. 1987), that the adequate protection provisions of § 1205 may extend post-

confirmation so long as it represents payment of present value of the allowed claim, and also *Big

Hook*'s citation to *In re Wobig*, 73 B.R. 292, 294-95 (Bankr. D. Neb. 1987) which held that if a

debtor proposes a plan which adequately protects the creditor's interest in the collateral, "the

Debtor is permitted to use cash collateral".  77 B.R. at 796, 4 Mont. B.R. at 529, quoting *Wobig*.

Debtors argue that their motion to sell the 20 acres and Harper Trust's motion for adequate

protection have been heard after notice, and the only testimony is Jeffery's and the realtor's that

the sale of 20 acres and payment of $175,000 to Harper Trust benefitted its debt-to-asset ratio

and provided it adequate protection as required under § 1205(b).  Debtors contend that their Plan

allows Harper Trust to retain its lien up to the value of its collateral and allowed claim, thus

satisfying § 1225(a)(5)(B), and that their Plan is feasible and should be confirmed.

The Chapter 12 Trustee advised the Court at confirmation hearings that in his opinion the

Debtors' Angus cow/calf and bull raising operation is a viable operation, that the Debtors are

working hard, that Debtors' Plan is "very feasible", and that Harper Trust has plenty of adequate

protection in the real property which has substantially increased in value.

**II.  § 1225(a)(5).**

Section 1225(a)(5) requires confirmation of a plan if:

(5) with respect to each allowed secured claim provided for by the plan –

> (A) the holder of such claim has accepted the plan;
> (B)(i) the plan provides that the holder of such claim retain the lien
> securing such claim; and
>> (ii) the value, as of the effective date of the plan, of property to be
>> distributed by the trustee or the debtor under the plan on account of

31

such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder

Subsections (A) and (C) do not apply in the instant case because Harper Trust has not accepted

Debtors' Sixth Amended Plan, and Debtors' Plan does not surrender any property which secures

its claim, although Harper Trust has received $175,000 in partial distribution of the proceeds

from the sale of 20 acres.

### A. § 1225(a)(5)(B)(i) – "retain the lien securing such claim".

Turning first to § 1225(a)(5)(B)(i), the Court respectfully disagrees with the criticism of

*Hanna* in *Stallings*, 290 B.R. at 790, advocating a strict reading of "retain the lien" in §

1225(a)(5)(B)(i) to prohibit the use of collateral.  This Court reads the plain language of the

applicable clause of § 1225(a)(5)(B)(i) more fully as "retain the lien securing such claim".  A

common maxim of statutory construction is that courts should disfavor interpretations of statutes

that render statutory language superfluous.  *Connecticut National Bank v. Germain*, 503 U.S.

249, 252-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).  This Court's interpretation, noted

twenty years ago in *Big Hook*, protects the creditor's right to receive the allowed amount of its

secured claim and retain a lien to the extent of the balance due, and avoids the creditor receiving

more than the present value of its secured claim.  *See Big Hook*, 77 B.R. at 797, 4 Mont. B.R. at

530.  To follow *Stallings*' strict reading of "the lien" without the context-providing language

"securing such claim" would give adequately protected oversecured creditors a veto on

confirmation of Chapter 12 plans simply by withholding consent, and potentially a windfall in

the form of appreciated property such as Harper Trust seeks.  That result is inconsistent with

Congress' intent in enacting Chapter 12 "to give family farmers facing bankruptcy a fighting

chance to reorganize their debts and keep their land." *Hanna*, 912 F.2d at 950, quoting

H.R.Conf.Rep. No. 958, 99th Cong., 2d Sess. 48; *In re Indreland*, 77 B.R. at 273, 4 Mont. B.R. at

501, quoting *In re Massengill*, 73 B.R. 1008, 1012 (Bankr. E.D. N.C. 1987).

Debtors' Sixth Amended Plan proposes that Harper Trust retain its lien on Debtors'

remaining property, after payment of a partial distribution of $175,000. The Debtors contend

that Harper Trust remains oversecured because its remaining collateral has a value of at least

$555,000. Harper Trust objects to Allen's testimony through Jeffery and argues Debtors are

bound by the stipulated value of $600,000 for the entire tract. This Court is not bound to ignore

the fact that less than ten percent of Debtors' real property was sold for $275,000, or almost half

the price at which the entire property was purchased. The 20 acres which was sold was not

irrigated, and the uncontroverted evidence is that it was not used in Debtor's operations, and that

its sale did not have any effect on Debtor's operations. On the other hand the $175,000 partial

distribution made a dramatic improvement on Harper Trust's debt to security ratio.

For purposes of valuation, an owner is competent to give his or her opinion on the value

of his or her property, most often simply by stating the conclusion without stating a reason. *See*

Hon. Barry Russell, BANKRUPTCY EVIDENCE MANUAL, 2000 ed. § 701.2; *South Central*

*Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir.

1980). While a debtor's estimate of value may be acceptable in certain cases, the Court may give

little weight to an opinion if not based upon sufficient facts. *In re Plummer*, 20 Mont. B.R. 468,

478 (Bankr. D. Mont. 2003); *In re Hungerford*, 19 Mont. B.R. 103, 118-19 (Bankr. D. Mont.

2001). Jeffery's testimony of the value of his remaining property after the sale of 20 acres is not

entitled to great weight, but in the instant cases his testimony is the only evidence in the record, and

as such is conclusive.  Harper Trust offered no evidence to show that the effect on the value of the remaining collateral was anything other than what Jeffery testified.  Accordingly, the Court overrules Harper Trust's objection to Jeffery's opinion testimony and finds that the sale of 20 acres reduced the value of the remaining property at most by $45,000, and that at least $555,000 in value remains to secure Harper Trust's lien.

Harper Trust's brief states its claim as $628,757.11, including $70,000 in post-petition professional fees for its attorney and expert fees and costs based solely on the testimony of Paul Harper.  However, Harper Trust has not complied with Mont. LBR 2016-1(d) which provides:

> If oversecured creditors wish to recover reasonable fees, costs, or charges provided for under the agreement under which the claim arose as a portion of the creditor's allowed secured claim pursuant to 11 U.S.C. § 506(b), the professionals retained by a creditor shown to be oversecured pursuant to 11 U.S.C. § 506(b) *must file* a fee application in accordance with the standards set forth in 11 U.S.C. § 330 and F.R.B.P. 2016(a)[29].  Reasonable fees and expenses of such professionals may be allowed by the Court as a portion of the allowed secured claim.

(Emphasis added).

The requirements for an award of fees under § 506(b) are discussed *In re Kord Enterprises II*, 139 F.3d 684, 687, 689 (9th Cir. 1998), requiring a showing that:

> (1) the claim is an allowed secured claim;  (2) the creditor is oversecured;  (3) the fees are reasonable;  and (4) the fees are provided for under the agreement[30] under which claim arose.  *See, e.g., Takisaki v. Alpine Group, Inc. (In re Alpine Group, Inc.)*, 151 B.R. 931, 935 (9th Cir. BAP 1993); *Meritor Mortgage Corp., West v. Salazar (In re Salazar)*, 82 B.R. 538, 540 (9th Cir. BAP 1987).

In determining whether fees are reasonable under § 506(b) the court must consider not only the

---

[29]Rule 2016(a), F.R.B.P., provides in pertinent part:  "An entity seeking ... compensation for services, or reimbursement of necessary expenses, from the estate shall file an application ...."

[30]BAPCPA added the language "or State statute" after "agreement" in § 506(b).

34

agreement, but also the overall fairness and reasonableness of the fee under all of the circumstances. *See In re Hungerford,* 19 Mont. B.R. at 136-138, *quoting In re Huhn,* 145 B.R. 872, 876 (Bankr. W.D. Mich. 1992); *In re K-Fab, Inc.*, 118 B.R. 240, 242 (Bkrtcy.M.D.Pa.1990) (*citing Lund v. Affleck*, 587 F.2d 75 (1st Cir.1978)).  That determination has not taken place because of Harper Trust's failure to file an application as required under Rule 2016(a) and LBR 2016-1(d).  Harper Trust's attempt to avoid its burden under *Kord* by a request the Court take judicial notice to Paul Harper's testimony is wholly insufficient.  As a result Harper Trust has not been awarded $70,000 in professional fees or any other amount as part of its allowed secured claim, and thus no amount of post-petition professional fees will be considered by this Court in determining the amount of Harper Trust's equity cushion, adequate protection, or as part of the analysis of "the lien securing such claim" under § 1225(a)(5).  Harper Trust's failure to comply with local rules and long-standing Ninth Circuit authority governing an award of fees and costs under § 506(b) is not explained, but this Court will not allow Harper Trust to derive any advantage, or cause any further delay in the confirmation process[31] as a result of its failure to comply.

Deducting the unsupported $70,000 in post-petition fees and costs from Harper Trust's figures leaves $558,757.11 as its allowed claim before the $175,000 partial distribution, and $383,757.11 as its allowed secured claim after the distribution secured by a lien in the Debtors'

---

[31]Pursuant to the Court's decision in *Indreland*, 4 Mont. B.R. at 502, 77 B.R. at 274, the Court may revisit the determination of the amount of Harper Trust's allowed claim if and when it complies with LBR 2016-1(d) and files an application.  In the event Harper Trust fails to comply within a reasonable period of the Plan, Debtors are invited to seek modification of their Plan to remove all post-petition fees and costs from their confirmed Plan's treatment of Harper Trust's claim.

remaining property worth at least $555,000. The Court concludes that Debtors' Sixth Amended

Plan satisfies § 1225(a)(5)(B)(i)'s requirement that the plan provides that the holder of the

allowed secured claim provided for by the plan "retain the lien securing such claim". *Big Hook*,

77 B.R. at 796-97, 4 Mont. B.R. at 529-30; *Wobig*, 73 B.R. at 294.

### B. § 1225(a)(5)(B)(ii).

Section 1225(a)(5)(B)(ii) requires that the value of property to be distributed by the

trustee or the debtor under the plan on account of such claim is not less than the allowed amount

of such claim. A leading commentator notes that the present value requirement of §

1225(a)(5)(B)(ii) is identical to the present value requirements of § 1129(a)(9), §

1129(b)(2)(A)(i)(II) and 1325(a)(5)(B)(ii), and therefore case law interpreting those provisions is

equally applicable to determining present value under § 1225(a)(5)(B)(ii). 8 COLLIER ON

BANKRUPTCY, ¶ 1225.03[4][c] (15th ed. 2005); *see also In re Hungerford*, 19 Mont. B.R. at 113-

14 (cases construing cramdown statutes under Chapters 11 and 12 provide valuable interpretation

of Chapter 13).

In Chapter 12 cases this Court has long employed a "market approach" to determine the

cramdown interest rate using a formula, starting with a base rate (either the prime rate or the rate

on treasury obligation) and adding a "risk factor" based on the risk of default and the nature of

the security. *See In re Fowler*, 903 F.2d 694, 697-98 (9th Cir. 1990); *In re Schaak*, 17 Mont. B.R.

349, 355-57 (Bankr. D. Mont. 1999); *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 127-28

(Bankr. D. Mont. 1987); *Hungerford*, 19 Mont. B.R. at 112-13 (quoting *Janssen Charolais*

*Ranch*). The Ninth Circuit in *Fowler* approved this Court's use of the formula approach in a

Chapter 12 case, but remanded the case for findings regarding the risk of default and nature of

36

the security when it was unable to determine the basis for the bankruptcy court's 0.75 % risk

factor or the district court's slightly higher factor.  *Fowler*, 903 F.2d at 698-99.

The United States Supreme Court in a Chapter 13 case, *Till v. SCS Credit Corp.*, 541 U.S.

465, 478-80, 124 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004) (plurality opinion), adopted the

formula approach over other approaches to establish a cramdown rate.  Together with *Till* and the

Ninth Circuit precedent in *Fowler*, this Court considers its long-standing formula approach still

good law.  This Court denied confirmation of Debtors' earlier Plan in its decision (Docket No.

205) because of insufficient evidence supporting an interest rate which was below the prime rate.

In Debtors' Sixth Amended Plan the interest rate for Harper Trust's claim, as well as Ag

Sales' claim, has been increased to 8.5% with 5 year balloon payments.   Korkow testified that

the 8.5% interest rate for Harper Trust's and AG Sales' claims includes a sufficient one-quarter

percent (1/4%) risk factor, based upon the increased value of the property when selling the 20

acres for development, and because Harper Trust has no cost-of-funds factor to consider.

Evidence of the nature of Harper Trust's remaining security, real property which has increased in

value since purchased by the Debtors, exists in the record.   Harper Trust objects to the interest

rate, but offered no testimony or other evidence which controverted Korkow's testimony, which

remains the only credible evidence in the record, and sufficient to persuade the Court to conclude

that the 8.5% cramdown rate satisfies the formula approach and includes an appropriate risk

factor to reflect Korkow's and Wicks' opinion that Debtors' Plans are tight and must factor the

risk of default into the cramdown rate.[32]

---

[32] The Federal Reserve Board on September 18, 2007 and October 31, 2007, decreased its
federal funds rate, which, in turn, reduced the prime rate from 8.25% to 7.75% to 7.5%, effective
October 31, 2007.

Risk is heightened to an extent based on the unpredictable nature of the agricultural economy. *Fowler*, 903 F.2d at 697, citing *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir. 1989). *Fowler* further requires consideration of risk of default and the nature of the security. COLLIER adds that the risk adjustment depends also on the duration of the payment stream and should be high enough to compensate creditor for risk, but not so high as to doom the plan. 8 COLLIER ON BANKRUPTCY, ¶ 1225.03[4][c] (discussing *Till v. SCS Credit Corp.*, 541 U.S. 465, 480, 124 S.Ct. 1951, 1961, 158 L.Ed.2d 787 (2004) (plurality opinion)). COLLIER also discusses cases discussing a range of risk factors at ¶ 1225.03[4][c] n.28, and states that although the parties can present evidence of risk factors at a hearing, the evidentiary burden is placed on the creditor to substantiate any risk adjustment over a moderate level. COLLIER, ¶ 1225.03[4][c]; *Till*, 541 U.S. at 484-85. At the confirmation hearing Harper Trust did not offer any evidence regarding risk factors, and thus failed their evidentiary burden under *Till.*

As no evidence or argument exists by Harper Trust to the contrary, the Court finds that the 30 year term with a 5 year balloon is likewise supported by credible evidence, and is not a dramatic difference from the original term of the contract for deed of just over 2 years with a balloon payment. The Court concludes that Debtors' Sixth Amended satisfied the requirements of § 1225(a)(5)(B)(ii) for an appropriate cramdown rate for the Harper Trust's and Ag Sales' secured claims under the formula approach.

The treatment of Harper Trust's claim in the Sixth Amended Plan provides for the value of Harper Trust's secured claim as $575,000, which includes an estimate of Harper Trust's post-petition professional fees which have not yet been property applied for or allowed in accordance with controlling Ninth Circuit authority. Nor does it reflect the $175,000 partial distribution.

38

Harper Trust is correct that the sale remains contemplated in the Sixth Amended Plan, but that is no reason to deny confirmation and is easily remedied in a final amendment. The difference between $575,000 and $175,000 is $400,000, and Debtors' evidence established that the payments under the Sixth Amended Plan pays Harper Trust the allowed amount of its secured claim as required under § 1225(a)(5)(B)(ii). *See, e.g., Big Hook*, 77 B.R. at 796-97, quoting *Wobig.*

   As the Court stated above, no further delay should occur in confirmation after numerous hearings, and Harper Trust will not benefit from its failure to file an application for its professional fees as required by this Court's Rules and controlling Ninth Circuit authority. Therefore, this Court will direct Debtors' to file a Final Amended Plan curing typographical errors, updating to include stipulations, adjusting the 2007 payment date to reflect a realistic but short period of time to make the 2007 payment, remove stale sale provision, and adjust the amount of Harper Trust's claim to reflect the $175,000 partial distribution but still pay it the amount of its allowed secured claim. Presently, the Sixth Amended Plan includes just over $16,000 to Harper Trust for its post-petition attorney's fees. While Harper Trust shall not benefit from its failure to file an application, as in *Indreland*, this Court will allow Harper Trust leave to seek redetermination of its claim if it chooses to follow the Rules and Ninth Circuit authority and seek fees and costs within the term of the Plan under 11 U.S.C. § 506(b). *See Indreland*, 77 B.R. at 274, 4 Mont. B.R. at 503 (allowing the creditor to seek redetermination of its claim after confirmation if the security does not sell at the value fixed by the Court)[33].

---

   [33]Harper Trust argued earlier that *Indreland* was effectively overruled by *In re Arnold & Baker Farms*, 85 F.3d 1415 (9th Cir. 1996), *cert. denied*, 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). This contention is incorrect. The Ninth Circuit's decision in *Arnold &*

### C.  Use of Cash Collateral & Adequate Protection.

Harper Trust argues that Debtors may not use its cash collateral in their Plan.  The Court notes that in *Stallings,* cited by Harper Trust, the court authorized debtors to use "significant amounts" of cash collateral prior to confirmation so they could farm.  290 B.R. at 780.  This was so even though, as far as the court could determine, the creditor was undersecured[34].  The instant case is distinguishable from *Stallings* in that Harper Trust has always been and remains oversecured, with its lien attaching to value well in excess of its allowed claim after partial distribution of $175,000.

Section 363(c)(2) provides:

The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection of this subsection unless –

(A) each entity that has an interest in such cash collateral consents; or
(B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

A Chapter 12 debtor has rights and powers of a trustee serving in a case under chapter 11

---

*Baker Farms* nowhere mentions *Indreland*, which was a Chapter 11 reorganization.   In addition, the Ninth Circuit cited *Indreland* in *In re Fobian*, 951 F.2d 1149, 1152 (9th Cir. 1991), *cert. denied* 505 U.S. 1220, 1221, 112 S.Ct. 3031, 3032, 120 L.Ed.2d 902 (1992).  While the United States Supreme Court in *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* __ U.S. __, 127 S.Ct. 1199, 1206-08, 167 L.Ed.2d 178 (2007) recently abrogated the "*Fobian* Rule" which dictated that attorney fees are not recoverable in bankruptcy for litigating issues peculiar to federal bankruptcy law, the Supreme Court did not discuss, decide or abrogate the other aspects of *Fobian*, including its reference to *Indreland*, and therefore *Indreland* remains good law in this District.

[34]The court wrote that it was unable to fix the amount of the creditor's unsecured claim, but the creditor argued that its claim was in the amount of $880,000 while debtors' plan proposed to pay about $611,000 on creditor's secured claim.  *Stallings*, 290 B.R. at 781, 785, 786-87

pursuant to 11 U.S.C. § 1203[35].

This Court noted in *In re Gall*, 12 Mont. 133, 138 (Bankr. D. Mont. 1993): "The Ninth

Circuit has found that 'the purpose underlying 11 U.S.C. § 363(c)(2) and (4)[36] require that a

debtor seek affirmative <u>express</u> consent from all parties involved before using cash collateral.'

*Freightliner Market Development Corp. v. Silver Wheel Freight*, 823 F.2d 362, 368 (9th Cir.

1987)." The record is unclear whether the Debtors expressly sought Harper Trust's consent, but

it is clear that Harper Trust does not consent to use of its cash collateral. Notwithstanding, §

362(c)(2)(A) and (B) are connected by the disjunctive "or", indicating that the court may

authorize the use of cash collateral after notice and a hearing. Such was the interpretation by the

Ninth Circuit BAP in construing § 363(c)(2):

> "The trustee or debtor in possession may use cash collateral only upon the
> conditions set forth in § 363(c)(2). That subsection requires either consent by the
> creditor to the use of its cash collateral, or a court order authorizing its use. Under
> § 363(e), in all cases the debtor must provide adequate protection of the creditor's
> interest as a condition of using cash collateral."

*Scottsdale Medical Pavilion v. Mutual Benefit Life Insurance Company in Rehabilitation*, 153

B.R. 295, 302 (9th Cir. BAP 1993), *aff'd.* 52 F.3d 244 (9th Cir. 1995) (adopting BAP's reasoning

as its own).

Section 363(e) provides in pertinent part:

---

[35]Section 1203 provides: "Subject to such limitations as the court may prescribe, a debtor
in possession shall have all the rights, other than the right to compensation under section 330,
and powers, and shall perform all the functions and duties, except the duties specified in
paragraphs (3) and (4) of section 1106(a), of a trustee serving in a case under chapter 11,
including operating the debtor's farm or commercial fishing operation."

[36]Section 363(c)(4) provides: "Except as provided under paragraph (2) of this subsection,
the trustee shall segregate and account for any cash collateral in the trustee's possession, custody,
or control."

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

Chapter 12 has its own section defining adequate protection, § 1205 which provides:

(a) Section 361 does not apply in a case under this chapter.

(b) In a case under this chapter, when adequate protection is required under section 362, *363*, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under *section 363* of this title or any grant of a lien under section 364 of this title results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of property securing a claim or of an entity's ownership interest in property;

(3) paying to such entity for the use of farmland the reasonable rent customary in the community where the property is located, based upon the rental value, net income, and earning capacity of the property; or

(4) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will adequately protect the value of property securing a claim or of such entity's ownership interest in property.

(Emphasis added). The italicized language above in § 363(b)(1) removes any doubt that adequate protection in return for use of cash collateral under § 363 is contemplated under § 1205. With respect to use of cash collateral in confirmation, the Eighth Circuit found "no merit" in the creditor's contention that the concept of adequate protection may not be used in deciding whether a chapter 12 plan should be confirmed, and observed that "confirmation requirements of §

42

1225(a) implicitly embody the concept of adequate protection for a secured creditor's claim." *Hanna*, 912 F.2d at 951. This Court agrees, and § 1205(b)(1) governing adequate protection specifically includes "use" under § 363, which in turn encompasses use of cash collateral.

Since as far back as 1985, this Court has consistently allowed the use of cash collateral for current operating expenses where the use is adequately protected by a sufficient equity cushion in the collateral under § 363(e), and the trustee or debtor has the burden of proof on the issue of adequate protection under 11 U.S.C. § 363(o[37]). *In re Sentinel Plumbing and Heating*, 1 Mont. B.R. 84, 87-88 (Bankr. D. Mont. 1985); *see also In re Tash Ranches, et al.*, 1 Mont. B.R. 278, 279 (Bankr. D. Mont. 1985) ("I find PCA is adequately secured on its loan and the use of the cash collateral by the Debtor is necessary to allow the Debtor to pay current operating expense. Section 363(a); *In re Mellor*, 734 F.2d 1396, (9th Cir. 1984)").

In 1986 this Court again cited *Mellor* in holding that the use of cash collateral under § 363(c) for current operating expenses (and past expenses) was adequately protected by sufficient equity cushion in the collateral. *In re Cache Creek Red Angus, Inc.*, 2 Mont. B.R. 202, 203 (Bankr. D. Mont. 1986); *In re Roberts Rocky Mountain Equipment, Inc.*, 2 Mont. B.R. 266, 269 (Bankr. D. Mont. 1986); *In re Borg*, 2 Mont. B.R. 381, 383-84 (Bankr. D. Mont. 1986); *In re VZ Ranch*, 3 Mont. B.R. 82, 92-94 (Bankr. D. Mont. 1986) (15% equity cushion sufficient for use of cash collateral).

The Ninth Circuit in *Mellor* explained that "the existence of an equity cushion as a method of protection . . . is the classic form of protection for a secured debt" and can provide

---

[37]BAPCPA changed the subsection assigning the burden of proof on adequate protection to 363(p).

adequate protection "standing alone". 734 F.2d at 1400. The Ninth Circuit BAP cited *Mellor* with approval in *In re Boulders on the River, Inc.*, 164 B.R. 99, 104 (9th Cir. BAP 1994), allowing the use of cash collateral where the creditor is adequately protected.

In *Big Hook*, this Court quoted *Wobig* for the proposition that a debtor "can propose a plan" which uses cash collateral if it adequately protects the creditor's interest in such proceeds:

> Chapter 12 does not absolutely prohibit debtors from using the proceeds of sale of certain collateral. This Court believes that if the debtor can propose a plan which "adequately protects" the interest of the creditor in the collateral, debtor may use such proceeds. This is no different than the standards for relief from the automatic stay under Section 362 and the standards for use of cash collateral under Section 363. Creditor must be protected, but if the creditor is protected, the Debtor is permitted to use cash collateral. The Court is aware that preconfirmation "adequate protection" analysis may not be applicable to the interest of the creditor, post confirmation. *See In re Monnier Brothers*, 755 F.2d 1336 at 1340, 41 (8th Cir. 1985). However, if a plan is feasible and meets other confirmation requirements, the creditor only has a right to receive the allowed amount of its secured claim and retain a lien on collateral to the extent of the balance due on the allowed secured claim. Any other conclusion prohibits Chapter 12 reorganization of a livestock operation.

*Big Hook*, 77 B.R. at 796-97, 4 Mont. B.R. at 529-30, quoting *Wobig*, 73 B.R. at 294.

This Court followed the above quote with: "In sum, if the Plan was confirmable, PCA would be protected under the confirmation standards. To accept the argument of PCA would mean it would receive more than the present value of its secured claim." *Big Hook*, 77 B.R. at 797, 4 Mont. B.R. at 530. In *Hanna*, *Wobig* was cited by the district court in affirming the bankruptcy court, as noted in *Hanna*, which itself cited *Wobig* in its decision. 912 F.2d at 951. *Big Hook* remains good law in this District, and this Court will continue to apply *Big Hook* and *Wobig* and allow use of cash collateral proposed by a plan which adequately protects the interest of the creditor in the collateral.

44

Harper Trust contends that it has an equity cushion of only 3.18% which it calls plainly inadequate. However, Harper Trust included in its calculation of its equity cushion not only its own claim but also Ag Sales' claim which is subordinate, and $70,000 in post-petition professional fees for which it has not filed an application for fees under § 506(b) as required by this Court's Rules and Ninth Circuit authority. Debtors argue that Harper Trust has an equity cushion of 22% which is within the range of the cases cited above as adequate protection.

Deducting Ag Sales' claim and unapproved post-petition fees from Harper Trust's calculation leaves its allowed claim at $558,757.11, which after the $175,000 partial distribution is deducted leaves $383,757.11, which is secured by property still worth $555,000 according to the record. The difference is $171,242.89, an equity cushion of 45%. Debtors' Sixth Amended Plan provides Harper Trust's allowed secured claim at $575,000, or $400,000 after the partial distribution. The equity shown in the Plan is $155,000, an equity cushion of 39% allowing for a portion of as yet undetermined post-petition fees. Based on the evidence in the record at the time of confirmation, this Court concludes that the Debtors' have satisfied their burden of proof under § 363(p)(1) and § 1205(b) to show that Harper Trust's allowed secured claim is adequately protected in the form of an equity cushion of at least 39%, standing alone as provided in *Mellor,* 734 F.2d at 1400. The Court further finds and concludes that the equity cushion shown by the record satisfies the requirements of *WRB West Associates*, and is adequately protected against erosion by accruing interest, depreciation or other changes. 106 B.R. at 220. Jeffery's and Allen's testimony established that Debtors' real property is in a highly desirable and marketable

area for recreational development[38].  As a result, Harper Trust's motion for additional adequate protection is denied.

Harper Trust argues that its post-petition professional fees and costs are allowable under § 506(b) and erode its equity cushion.   However, Harper Trust failed to follow this Court's Rules or controlling Ninth Circuit authority to obtain an award of reasonable fees and costs under § 506(b), so the Court has little sympathy for Harper Trust's stance.  As stated above the Court will allow Harper Trust to seek redetermination of its claim under its authority stated in *Indreland*, provided it follows the Rules, but for purposes of confirmation, that train has left the station.

### D.  Feasibility – § 1225(a)(6).

Harper Trust earlier objected to confirmation on the grounds the Debtors' Plan was not feasible, and included feasibility in its current objection but did not address it in its brief. Debtors argued that feasibility is no longer at issue.

The feasibility requirement is set forth at 11 U.S.C. § 1225(a)(6), which requires for confirmation that "(6) the debtor will be able to make all payments under the plan and to comply with the plan."  Debtors have the burden of proving that their Plans have a reasonable chance of success.  *In re Schaak*, 17 Mont. B.R. 349, 357 (Bankr. D. Mont. 1999), citing *In re Martin*, 66 B.R. 921, 926 (Bankr. D. Mont. 1986).  This Court observed in *Schaak*:

> While economic certainty is not a necessary element of feasibility, courts cannot confirm plans that are purely "visionary," *Pizza of Hawaii, Inc. v. Shakey's, Inc. (Matter of Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).  This Court fashioned the test for feasibility under Chapter 12 on a prior occasion as thus:
>
>> [T]he benefit of the doubt in Chapter 12 cases will be given to farmers, if

---

[38]While the Trustee did not testify, he advised the Court at the hearing that the value of Debtors' real property has markedly increased.

> it appears that a reasonable chance of meeting their payments as
> projected under a plan [sic].

*In re Rugg*, 8 Mont. B.R. 457 (Bankr. D. Mont. 1990) (quoting *In re Hansen*, 77
B.R. 722 (Bankr. N.D. 1987).

The Ninth Circuit BAP has stated that the debtor is not required to guaranty the ultimate success

of his plan, but only to provide a reasonable assurance that the plan can be effectuated, and that

reasonable assurance must rise above "bare agronomic feasibility." *Miller v. Nauman*, 213 B.R.

355, 358 (9th Cir. BAP 1997); *Stallings*, 290 B.R. at 791, quoting *Nauman.*

Korkow admitted at the October 31, 2006, confirmation hearing that Debtors' Plans and

budget are "tight." Wicks' expert opinion was that all Chapter 12 plans are tight. The Court

found considerable persuasive evidence that Jeffery and Shoni are highly educated and

experienced at animal science, they earn income on and off the farm, and Jeffery in particular is

expert at breeding and raising breeding Angus bulls and cattle, using cutting edge embryo

transfer technology.

On the other hand Korkow admitted that Jeffery continues to lose money on his cattle

operations, and the feasibility of Debtors' Plan depends on their off-farm income. Shoni testified

that her off-farm income has not changed from the last confirmation hearing. Wicks' testimony

that cattle prices would decline in 2007 was confirmed in part by the results of the March 2007

sale which brought far less than Debtors' projections for most of his bulls. But those results also

showed exceptionally high prices for certain of Jeffery's bulls, even at a disappointing public

sale.

According to Wicks, cattle prices are near the beginning of a 5 year downturn in the

cycle, which encompasses the entire term of Debtors' Sixth Amended Plan. In other words, the

admitted losses in Jeffery's cattle operations could increase as cattle prices decrease, while Debtors' off-farm income has not changed.

Walker's earlier testimony that Debtors' Fifth Amended Plan does not cash flow was not repeated at the August 30, 2007, hearing on confirmation. While Walker's exhibits showed a loss in cash flow, as this Court stated in open court the sale of 20 acres for $275,000 changed the situation. Without that sale, the Court likely would have concluded that Debtors' Plan was not feasible. With the sale and partial distribution of $175,000 to Harper Trust, the Court now concludes that Debtors have satisfied their burden of proving that their Chapter 12 Plan is feasible in satisfaction of § 1225(a)(6).

The 20-acre sale demonstrated what the Trustee argued, i.e., that Debtors could sell additional parcels at markedly increasing amounts to rapidly pay down Harper Trust's claim, and while no sales are contemplated the Trustee has unique power under § 1206 to sell property. The sale shows that the property has increased in value, and from hereon the Court considers the $600,000 stipulated value of Debtors' entire parcel outdated and unworthy of probative weight.

The results of the March 2007 cattle sale supports Walker's and Wicks' opinions that the Debtors' earlier Plans were not feasible. No dispute exists, and Korkow admitted, that the March 2007 sale was a disappointment, as shown by the prices on Ex. H-35. If cattle prices continue to decline, as Wicks testified, Debtors' cash flow could further weaken. Weighing in favor of Debtors is their education, training, experience, and their demonstrated motivation and ability.

This case has been long and draining on all the parties. Jeffery has suffered setbacks, such as when he agreed with Korkow's suggestion to participate in a public bull sale. Yet even in the midst of overall disappointing results, Ex. H-35 includes some remarkably high prices for

48

some of Jeffery's bulls, which demonstrates that his program of improved beef production through embryo transfers produces results in beef quality which can bring premium prices in a falling cattle market.  His proven ability to raise high quality Angus cattle weighs in favor of feasibility.

The evidence of both Jeffery's and Shoni's expertise in animal science is undisputed. Also undisputed is their belt-tightening during this case.  Shoni not only increased her income as a veterinarian but decreased their living expenses.  The Court further notes Jeffery's ability to negotiate for higher bull prices in private treaty sales, which he prefers as a marketing method, and his flexibility in entering into cow/calf sharing and barter transactions with his bull buyers and lessors Vannoys, who the record does not show have any problem with their still unpaid lease.  The Court notes with concern the disappearance from the cash flow projections on the first and seventh pages of Ex. 1, of the $31,000 capital gains tax from the 20-acre sale reflected on the corresponding pages of Ex. 2, but Harper Trust did not object on that basis and Jeffery's testimony included losses which, on further analysis by Debtors' expert, may have offset that gain.

The Court notes the Chapter 12 Trustee has voiced enthusiastic support for confirmation of Debtors' Sixth Amended Plan and advised the Court that they are cooperating, working hard and have a good chance of success, and the Plan is "very feasible."  The Trustee's support was enough for the Court to give the Debtors the benefit of the doubt and a last chance after the October 31, 2006, confirmation hearing.  Based on the present record, after notice and a hearing and the Trustee's support, the Court concludes that Debtors have satisfied their burden of proving that their Plan has a reasonable chance of success in satisfaction of the feasibility

49

requirement of § 1225(a)(6).

### E.  Other Objections.

Harper Trust listed several objections to confirmation of the Sixth Amended Plan, but did not address several of them in its post-hearing brief and they are deemed abandoned, including that the Plan proposes negative amortization of secured claims, the Plan is not proposed in good faith, and the Debtors are not eligible for Chapter 12 relief.  The Court affirmatively finds, based on the record, that Debtors have proposed their Sixth Amended Plan in good faith and not by any means forbidden by law in satisfaction of 11 U.S.C. § 1225(a)(3), and that Debtors have satisfied all other requirements for confirmation of their Plan set forth in § 1225.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 12 bankruptcy under 28 U.S.C. § 1334(a).

2. This is a core proceeding involving confirmation of a plan under 28 U.S.C. § 157(b)(2)(L).

3. Debtors satisfied their burden of proof under 11 U.S.C. § 1225(a)(5)(B) to show that Harper Trust retains a lien on collateral to the extent of the balance due on its allowed secured claim, and that Debtors' Sixth Amended Chapter 12 Plan provides Harper Trust with not less than the allowed amount of its claim plus a provision for professional fees, subject to further proceedings.  *In re Big Hook Land & Cattle Co.*, 77 B.R. 793, 796-97, 4 Mont. B.R. 523, 529-30 (Bankr. D. Mont. 1987); *In re Indreland*, 77 B.R. 268, 273, 274 (Bankr. D. Mont. 1987); *In re Janssen Charolais Ranch, Inc.*, 73 B.R. 125, 127, 4 Mont. B.R. 290 (Bankr. D. Mont. 290).

4. Harper Trust is adequately protected in satisfaction of 11 U.S.C. § 1205(b), for Debtors' use of Harper Trust's cash collateral in order to fund their operations and Chapter 12

Plan. *Big Hook*, 77 B.R. at 796, 4 Mont. B.R. 523, 529-30 ; *In re Wobig*, 73 B.R. 292, 294 (Bankr. D. Neb. 1987).

5.  Debtors satisfied their burden of proof under 11 U.S.C. § 1225(a)(6) to show that their Plan is feasible.

6.  Debtors have satisfied their burden to show that their Sixth Amended Plan is proposed in good faith and not by any means forbidden by law in satisfaction of 11 U.S.C. § 1225(a)(3).

7.  Debtors have satisfied their burden of proof to show all other requirements for confirmation of their Plan set forth in § 1225 are satisfied.

**IT IS ORDERED** a separate Order will be entered in conformity with the above overruling Harper Trust's objections to confirmation (Docket No. 313), filed August 23, 2007, and granting Debtors ten (10) days to file a Final Amended Chapter 12 Plan; and after review of the Final Amended Plan to ensure conformity with the above[39] the Court will enter an Order confirming Debtors' Final Amended Plan without further notice or hearing, but subject to possible future proceedings as discussed above to adjust Harper Trust's allowed secured claim.

BY THE COURT

*Ralph B Kirscher*

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

---

[39]In drafting the Final Amended Chapter 12 Plan, in addition to removing the provision seeking approval of the 20-acre sale, correcting typographical errors and incorporating stipulations with the parties if desired, consistent with the above, Debtors shall take care in drafting the date of the 2007 plan payment to allow adequate time for mailing to ensure that they are able to make the payment on time.

51

52